[No. B010816. Second Dist., Div. One. Oct. 30, 1987.]

JOHN POAG et al., as Co-trustees, etc., Plaintiffs and Appellants, v. LAURA WINSTON, Defendant and Respondent.

**COUNSEL**

Haight, Dickson, Brown & Bonesteel, Roy G. Weatherup and Thomas N. Charchut for Plaintiffs and Appellants.

Laura Winston, in pro. per., for Defendant and Respondent.

**OPINION**

**SPENCER, P. J.—**

### INTRODUCTION

Trustees John Poag, Sol Price and Harry Volk appeal from an order determining the rights of Laura Winston in the assets of Ben Weingart Revocable Trust Number One. The trustees petitioned for such a determination, pursuant to Probate Code section 1138.1, alleging

respondent had violated the terms of a "no contest" provision added to the trust by amendment. Following a trial, the court found in favor of respondent.

## STATEMENT OF FACTS

Ben Weingart Revocable Trust Number One was established by written declaration of trust on August 1, 1971. Respondent is one of approximately 29 beneficiaries named in the trust instrument. Pursuant to paragraphs 3.4.3 and 3.4.4, respondent was to receive $40,000 upon the death of the trustor and the use of a two-bedroom apartment and any tangible personal property used in connection therewith, rent-free, in a building owned by the trust estate or, in the discretion of the trustees, the monthly cash equivalent of the apartment's rental value, for the lesser of respondent's lifetime or 15 years from the date of the trustor's death. In addition, respondent was to receive $2,000 per month for 180 months commencing at the trustor's death; pursuant to paragraph 3.8, that amount could be increased. The foregoing provisions were added to the trust instrument by an amendment dated August 19, 1971.

A further amendment to the trust instrument, dated August 27, 1971, also provided respondent with the use of a Cadillac or equivalent quality automobile for 10 years commencing at the trustor's death. A further amendment, dated August 31, 1971, provided respondent with a life estate in an undivided 75 percent interest in the real property located at 415 South Westlake, Los Angeles, California, as of the date of the trustor's death. The trust instrument was again amended on February 28, 1973, to provide respondent with a lifetime interest in all net income from the 415 South Westlake property, as well as real property located at 401 and 437 South Westlake, commencing at the trustor's death.

On June 29, 1973, the trust instrument was further amended to add paragraph 10.8 to article 10 of the original declaration of trust. Paragraph 10.8 provides: "The provisions of this Trust Agreement are in each case conditioned that the beneficiaries named in each case shall not, directly or indirectly, aid, counsel, commence, or prosecute any demands, claims, negotiations, suits, actions or proceedings; in any court of law, or other arenas, having as an object:

"A. The defeat in whole or in part of this Trust Agreement, or any provision or part thereof; or

"B. The obtaining for anyone of (i) anything of value from this Trust or my estate, (ii) any of the assets of this Trust or of my estate, or (iii) any

assets in which I had an interest immediately prior to my death, grounded on, arising out of, or related to any claimed or actual agreement, representation or understanding not expressly set forth in a written and executed agreement that I would (or would cause another to) deliver to anyone anything of value (directly or indirectly, in trust, by will, or otherwise) as a gift, or for services or any other thing of value (including by way of example but not limitation any employment or assistance) received by me or another. The word 'another' includes anyone or more (or combination thereof) people, partnership, corporations, trusts, estates or other entities.

"I revoke and annul all gifts and provisions in trust herein made to any beneficiary if such beneficiary directly or indirectly aids, counsels, commences or prosecutes any such demands, claims, negotiations, suits, actions or proceedings (any such beneficiary being called a 'Contestant'), and in each such case for money or property which is by this Trust Agreement provided . . . for the benefit of any such Contestant, shall thereupon lapse or terminate.

"2. This Amendment shall be effective as of . . . August 19, 1971, with the same force and effect as if the provisions of this Amendment had been set forth in Trust Number One on that date."

In October 1974, Mr. Weingart directed the preparation of three documents: an irrevocable lifetime trust of which respondent was to be the beneficiary, an agreement to make a codicil to his will and a fifth codicil to his will. At some point prior to October 21, 1974, Mr. Weingart came into possession of three writings entitled "Summary of Terms of Laura Winston Irrevocable Charitable Remainder Unitrust," "Summary of Agreement to Make a Codicil and Summary of Fifth Codicil" and "Fifth Codicil."

The "Summary of Terms of Laura Winston Irrevocable Charitable Remainder Unitrust" states generally the trust will be funded with a corpus of $1 million in tax-free municipal bonds; respondent is to have a life interest in all income from the trust corpus and, upon her death, the corpus is to be transferred to an existing charitable trust. Paragraph 6.5 provides: "Laura gives up any and all claims against Mr. Weingart's assets or estate, except for: "a. The net income from this Trust.

"b. The property to be given her under Mr. Weingart's Fifth Codicil.

"c. Any food or clothing, or other miscellaneous items not exceeding $10,000 per year, which Mr. Weingart may give her." Paragraph 7 invokes a forfeiture should respondent violate the conditions of this trust.

On October 21, 1974, Mr. Weingart deleted the figure "$1,000,000" in the description of the trust corpus and substituted instead the figure "$2,000,000," initialing the changes. He also deleted paragraph 7, invoking a forfeiture, and initialed that change. He signed and dated the document, indicating his intent to do so to William S. Kroger; his signature was witnessed by Mr. Kroger and Luta King.

The document entitled "Summary of Agreement to Make a Codicil and Summary of Fifth Codicil" provides: "Mr. Weingart agrees to make a Fifth Codicil to his Will, in which he will leave the following assets to Laura Winston: "1. The residence located at 228 South Hudson Avenue, Los Angeles, California;

"2. All of the clothing and household furniture located at the above residence, and Mr. Weingart's jewelry;

"3. Fifty thousand dollars ($50,000) in cash. . . .

"Mr. Weingart agrees that he will not sell or give away the residence or furniture or jewelry and that he will not revoke or change the Fifth Codicil." The next two paragraphs have been excised and marked "out" in Mr. Weingart's handwriting; each of these markings is followed by the initials "BW," also in his handwriting.

A document entitled "Fifth Codicil" provides in pertinent part: "In consideration of and on condition that Laura Winston shall be a faithful, true and helpful friend and companion to me at all times subsequent to the date of the execution of this Fifth Codicil to my Will, I entered into an agreement with Laura Winston, dated October ___, 1974, that I would create this Fifth Codicil to my Will. Based on such agreement, the following changes are made in my Will: ". . . . I give, devise and bequeath to Laura Winston:

"3.1 My interest in my residence at 228 South Hudson Avenue, Los Angeles, California 90004.

"3.2 All of my interest in the clothing, household furniture and furnishings located in my said residence and my jewelry.

"3.3 Fifty thousand Dollars ($50,000) in cash.

". . . . . . . . . . . . . . . . . . ."

The initial paragraph of "Fifth Codicil Article 3" up to the phrase beginning, "I give . . . ," and the concluding paragraph thereof are excised and

marked "out" in Mr. Weingart's handwriting; each marking is followed by the initials "BW," also in his handwriting. Subparagraphs 3.1, 3.2 and 3.3 are checked off and initialed "BW" in Mr. Weingart's handwriting. The typewritten copy is followed by the words, "These are gifts do not take away BW," again in Mr. Weingart's handwriting.

Shortly thereafter, Mr. Weingart became the object of a petition for conservatorship. Temporary conservators were appointed ex parte on October 29, 1974; an order granting the petition and appointing permanent conservators of the person and estate of Mr. Weingart was made on November 19, 1974.

On April 15, 1975, respondent filed an action against Messrs. Poag, Price, Rosenburg and others in their individual capacities. The complaint asserts claims for negligent and intentional interference with contractual relations and prospective economic advantage. Respondent alleges a long-standing relationship of companionship, friendship, care and business association between respondent and Mr. Weingart, as well as Mr. Weingart's desire that the relationship continue, in return for which he would see that respondent's lifetime economic needs were met.

The complaint specifically alleges in pertinent part: "In early 1974, WEINGART directed the [conservator] defendants . . . to have the Lawyer defendants provide additional benefits for plaintiff by Will." Accordingly, an agreement to make a codicil and a draft of a fifth codicil were drafted, as was a trust agreement. "Defendants failed to comply with the instructions of WEINGART and placed restrictions and limitations" in the draft documents to which both Mr. Weingart and respondent objected. "When the defendants presented [the documents] to plaintiff for execution they threatened to [institute a conservatorship] and to prevent WEINGART from making any arrangements for the benefit and support of Plaintiff if plaintiff refused to sign said documents."

The complaint further alleges Mr. Weingart gave additional instructions for the preparation of these documents with which the defendants failed to comply. "Had he not been prevented from doing so by the wrongful acts of defendants . . . , WEINGART would have [carried] out his . . . promises to . . . plaintiff [by executing the described documents in a legally enforceable form] and would have maintained . . . his relationship with the plaintiff." As a consequence of Mr. Weingart's actions and the preparation of these draft documents, "plaintiff had reasonable expectations" that she would benefit from Mr. Weingart's promises to her. She was entitled to and reasonably did rely on these promises. Defendant's obstruction of the implementation of Mr. Weingart's wishes was intentional and was designed to

thwart respondent's expectations, as well as to interfere with her relationship with Mr. Weingart; this resulted in damage to respondent.

On October 20, 1976, respondent also initiated an action against Messrs. Rosenburg, Poag and Price in their capacities as conservators of the person and estate of Mr. Weingart. The complaint seeks specific performance, removal of the trustees of the "Laura Winston Irrevocable Charitable Remainder Unitrust," the imposition of a constructive trust, asserts a theory of promissory estoppel and seeks further damages on a theory of quantum meruit.

The complaint specifically alleges in pertinent part: "On several occasions during the ten years prior to [imposition of a temporary conservatorship on October 29, 1974], WEINGART asked Plaintiff to promise to stay with and care for him as long as he lived, and Plaintiff agreed to do so, and WEINGART promised Plaintiff partly orally and partly in writing that he would take care of her and she would never have to worry about her financial needs as long as she lived." Plaintiff fulfilled her promises until she was ejected from Mr. Weingart's residence by the defendants on October 30, 1974, after which the defendants deliberately and intentionally prevented her from attending to her duties to Mr. Weingart.

The complaint further alleges in pertinent part: "On or about October 22, 1974 . . ., as a means of partially complying with his promise . . ., WEINGART executed the LAURA WINSTON Irrevocable Charitable Remainder and the document entitled 'Summary of LAURA WINSTON Irrevocable Charitable Remainder Unitrust', which documents were prepared at the direction of the Defendants . . . . By the terms of said trust agreement, as changed in writing by WEINGART, WEINGART agreed to transfer in trust to Defendants . . . as Trustees, $2,000,000 in then present reasonable market value of tax free municipal bonds. . . . It is and has been within the power of Defendants . . . to perform under said trust agreement [which performance plaintiff has demanded, but] Defendants refused and still refuse to [perform]."

The complaint continues: "WEINGART further promised partly orally and partly in writing to Plaintiff that as a means of carrying out his promise [to her], he would execute a codicil to his will leaving Plaintiff his residence at 228 South Hudson Avenue, . . . togehter [sic] with the clothing, household furniture and furnishings located in said residence and his jewelry and in addition the sum of $50,000.00, and . . . he would execute the Fifth Codicil of October __, 1974, to the Will of BEN WEINGART . . . ." Mr. Weingart intended to induce respondent's reliance on these promises and respondent did in fact rely reasonably on them. Notwithstanding Mr.

Weingart's clear expression of intent, expressed in writing and toward the implementation of which he had taken substantial steps, all of which defendants clearly knew, defendants refused and failed to implement and honor these promises. As a consequence, respondent has suffered substantial detriment and "been deprived of her rightful interest as a beneficiary under the Fifth Codicil . . . [in the] sum of $300,000, the value of the assets which would have been left to Plaintiff under the terms of the Fifth Codicil." Hence, she seeks the recovery of that sum in damages from the conservators.

Finally, the complaint alleges defendants "breached," i.e., interfered with, respondent's agreement with Mr. Weingart by ejecting her from his residence, preventing her from caring for or having any contact with him and failing to pay for her financial needs. Until the time of defendants' interference, respondent performed all conditions of the agreement on her part; she has been and continues to be ready and able to continue performance. The reasonable value of her support for the remainder of her life is $1 million, which sum she seeks in damages.

Mr. Weingart died on December 22, 1980, thereby terminating the conservatorship. Upon his death, Ben Weingart Revocable Trust Number One became irrevocable.

On July 20, 1981, respondent brought a petition for support and maintenance in the conservatorship proceeding. The petition alleges the conservators committed wrongful acts "to defraud your petitioner from her lawfully entitled benefits [for the sole purpose of precluding her] from efforts to restore the late Ben Weingart to his lawful status, and dismiss the conservatorship . . . ." It further alleges the conservators knew respondent was entitled to certain support and other benefits, based on her agreement with Mr. Weingart and a pattern followed for more than 10 years, yet they deliberately and wrongfully ousted her from the enjoyment of those benefits. By their acts, the conservators damaged respondent and it is necessary that the court determine the damage caused by these wrongful acts. Respondent has been entitled to this support and maintenance at all times since it was first denied her at the inception of the temporary conservatorship. She seeks immediate temporary relief, pending a determination of the matter.

In the interim, respondent had filed a petition to stay the interment of Mr. Weingart's remains, in which she asserted it was Mr. Weingart's testamentary intent and desire to be cremated, and a supplemental petition for probate. Respondent's supplemental petition did not dispute the legitimacy

of Mr. Weingart's will and the four codicils orginally offered for probate, but referred to additional codicils, three letters, the executed summary of the provisions of the Laura Winston Irrevocable Charitable Remainder Unitrust and the agreement, not formally executed, to make a fifth codicil, all of which respondent characterized as testamentary documents. On April 8, 1981, the probate court ordered the supplemental petition off calendar for defects in its documentation.

On various occasions, respondent objected to the executors' settlement of lawsuits involving the business interests of Mr. Weingart. In late 1981, respondent made a motion for relief from the order admitting Mr. Weingart's will to probate; she asserted the existence of excusable mistake or neglect, pursuant to Code of Civil Procedure section 473. The motion was denied on December 1, 1981.

The probate court approved the executors' petition to sell Mr. Weingart's residence. Thereafter, on July 2, 1981, respondent brought a petition pursuant to Probate Code section 851.5, in which she asserted a claim to Mr. Weingart's residence. The claim resembles those formerly asserted: it is grounded upon the original conservators' alleged interference, by instituting conservatorship proceedings wrongfully, with formal execution of the agreement to make a fifth codicil, thereby allegedly entitling respondent to the imposition of a constructive trust. The petition was denied and the residence subsequently was sold. The court approved the sale on March 9, 1982, after which respondent moved for reconsideration, challenging the court's jurisdiction to order confirmation of the sale and the capacity of the executors. The motion was denied.

On March 29, 1982, preliminary distribution to the trustees of Ben Weingart Revocable Trust Number One was ordered, thereby fully funding that trust. Consequently, the court determined on June 4, 1982, that respondent no longer was an interested party in the estate proceedings and had no further standing with respect to the ongoing administration of the estate. Respondent appealed the three latter orders.

CONTENTION

Appellants contend the trial court erred as a matter of law in determining respondent did not violate the "no contest" clause of Ben Weingart Revocable Trust Number One. For the reasons set forth below, we disagree.

## DISCUSSION [1]

The interpretation of a written instrument, including a will or declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; *Estate of Russell* (1968) 69 Cal.2d 200, 213 [70 Cal.Rptr. 561, 444 P.2d 353].)

A "no contest" clause in a will or declaration of trust is valid and must be given effect according to the intent of the testator or trustor, as that intent appears from the terms of the instrument itself and the surrounding circumstances. (*Estate of Bergland* (1919) 180 Cal. 629, 633 [182 P. 277, 5 A.L.R. 1363]; *Estate of Basore* (1971) 19 Cal.App.3d 623, 630 [96 Cal.Rptr. 874].) Inasmuch as such a clause may work a forfeiture, it is to be strictly construed with no wider scope given the language than clearly is necessary to give effect to its intent. (*In re Kitchen* (1923) 192 Cal. 384, 389-390 [220 P. 301, 30 A.L.R. 1008]; *Estate of Schreck* (1975) 47 Cal.App.3d 693, 697 [121 Cal.Rptr. 218]; *Estate of Basore, supra,* 19 Cal.App.3d at p. 630.) In construing the language of the clause, ordinary words must be given their normal, popular meaning (Civ. Code, § 1644; *Sayble* v. *Feinman* (1978) 76 Cal.App.3d 509, 514 [142 Cal.Rptr. 895]), while it must be presumed legal terms are used in their legal sense (*Estate of Carter* (1956) 47 Cal.2d 200, 205 [302 P.2d 301]).

The initial proscription in the instant "no contest" clause, that no trust beneficiary shall "directly or indirectly, aid, counsel, commence or prosecute any demands, claims, negotiations, suits, actions or proceedings; in any . . . arena[ ]," fairly may be read as prohibiting the encouragement or undertaking of any sort of legal or equitable claim which has one of four particular objectives. This is broad language, generally intended to limit trust beneficiaries to preestablished entitlements, thereby preserving the integrity of Mr. Weingart's testamentary intent or plan.

---

[1] Noting respondent has not filed a brief in this matter, appellants rely on *Roth* v. *Keene* (1967) 256 Cal.App.2d 725, 727 [64 Cal.Rptr. 399] for the proposition that this court should assume the truth of appellant's statement of facts and respondent's abandonment of any attempt to support the judgment, thereby leading to the conclusion appellant's assertions are meritorious. We note, however, that the judgment is presumed correct (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]) and the burden is on appellants to demonstrate affirmatively not only the existence of error but resulting prejudice (*Tupman* v. *Haberkern* (1929) 208 Cal. 256, 263 [280 P. 970]). Hence, "the better rule is to examine the record on the basis of appellant[s'] brief and to reverse only if prejudicial error is found." (*Walker* v. *Porter* (1974) 44 Cal.App.3d 174, 177 [118 Cal.Rptr. 468]; accord, *In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 854 [192 Cal.Rptr. 212].)

The first of the four prohibited objectives is equally clear: "The defeat in whole or in part of this Trust Agreement, or any provision or part thereof." Although the term "defeat" may be understood in a legal sense, there is no appreciable difference in meaning from that ordinarily and popularly understood. The word commonly is defined as "nullify" or "frustrate"; "frustration by nullification or by prevention of success." (Webster's New Collegiate Dict. (6th ed. 1979) p. 294, col. 1.) It is in this sense that the word "defeat" must be understood in the instant context. (Civ. Code, § 1644; *Sayble* v. *Feinman, supra,* 76 Cal.App.3d at p. 514.) Hence, the first prohibited objective encompasses the encouragement or assertion of any claim or proceeding which seeks to nullify or prevent the successful implementation of any part or all of the declaration of trust.

In their general scope, the remaining three prohibited objectives are equally clear, particularly when read with subparagraph 3.3 of the declaration of trust. This subparagrah provides in pertinent part: "During Trustor's lifetime, the Trustees shall distribute to Trustor the entire net income of the Trust and such part or all of the principal of the Trust as the Trustor shall from time to time request in writing. Subsequent to the death of Trustor, the Trustees shall distribute the net income and principal of the Trust to such beneficiaries and on such terms and conditions as is provided herein . . . ." In sum, subparagraph 3.3 is unequivocal in providing nothing of value to the named beneficiaries until after the death of the trustor, Mr. Weingart.

The last three prohibited objectives are obtaining for any person "(i) anything of value from this Trust or my estate, (ii) any of the assets of this Trust or of my estate, or (iii) any assets in which I had an interest *immediately prior* to my death." (Italics added.) The use of the italicized language, considered in conjunction with subparagraph 3.3, leads to the logical conclusion "estate" must be understood in this context as meaning Mr. Weingart's testamentary estate and not his inter vivos estate. Since the trust was revocable and nothing of value attached to any person other than the trustor unless named as a beneficiary of a still-existing trust at the time of Mr. Weingart's death, no broader meaning need be given the word "estate" to effectuate the clear intent of the "no contest" clause.

It is the limiting language following the provisions heretofore discussed which is somewhat problematic in its interpretation. The latter three enumerated objectives are prohibited only if they are "grounded upon, aris[e] out of, or relate[ ] to any claimed or actual agreement, representation or understanding *not expressly set forth in a written and executed agreement* that I would (or cause another to) deliver to anyone anything of value (directly or indirectly, in trust, by will, or otherwise), as a gift, or for

services or any other thing of value . . . received by me or another." (Italics added.)

The emphasized language is the linchpin to the interpretation of the limitation. "Written agreement" is clear enough, but "executed agreement" may be given one of two commonly understood legal meanings. As provided in Civil Code section 1661, "An executed [agreement] is one, the object of which is fully performed," i.e., carried out according to its terms. (See also Statsky, West's Legal Thesaurus/Dict. (1986) p. 295.) However, the term "executed" also carries the legal meaning of "carried into full effect, taking effect immediately," i.e., the *signing* of a written agreement. (*Ibid.*)

Logically, the language at issue must be interpreted in the latter sense: "a written and executed agreement" must be construed to mean a written and *signed* agreement. Were the language to be construed in the former sense instead, the limitation would be purposeless: there is no need to claim benefits emanating from a fully performed agreement, while the need may indeed arise in relation to a written and signed, but unperformed, agreement. Hence, taken in the most logical sense, the limiting language exempts from the provisions of the "no contest" clause claims "grounded on, arising out of, or related to," a written and signed document expressing an "agreement, representation or understanding" to confer a benefit on the claimant as a gift or in consideration of the receipt of something of value.

Having determined generally the meaning and intent of the "no contest" clause and the scope of its operation, the ultimate question posed is whether respondent in any manner violated its terms. Appellants characterize several legal proceedings in which respondent participated as violative of the "no contest" clause. They first attack an action respondent filed on April 15, 1975, against Messrs. Poag, Price, Rosenburg and others in their individual capacities. The complaint asserts claims for negligent and intentional interference with contractual relations and prospective economic advantage.

Clearly, this action seeks to impose personal liability on the named defendants, as individuals, for their tortious interference with respondent's contractual relations and identifiable prospective economic advantages. Hence, it asserts no claim to any asset of and poses no threat, in whole or in part, to Ben Weingart Revocable Trust Number One. Neither does it assert any claim to any asset of Mr. Weingart's estate, either inter vivos or testamentary. To the contrary, it seeks only to recover damages from the named

individual defendants. In sum, respondent's initiation of this action can in no manner be deemed a violation of the "no contest" clause.[2]

■ Appellants next attack an action respondent filed on October 20, 1976, against Messrs. Rosenburg, Poag and Price in their capacities as conservators of the person and estate of Mr. Weingart. The complaint seeks specific performance, removal of the trustees of the "Laura Winston Irrevocable Charitable Remainder Unitrust," the imposition of a constructive trust, asserts a theory of promissory estoppel and seeks further damages on a theory of quantum meruit.

Again, this action poses no threat to Ben Weingart Revocable Trust Number One and makes no claim against any asset of that trust or of Mr. Weingart's testamentary estate. At most, it asserts a claim to assets of the *conservatorship* estate in the form of $2 million in tax free municipal bonds and that claim is based on a "written and executed," i.e., signed, document. In addition, it asserts a claim to monetary damages in the sum of $1.3 million.

The character of a legal proceeding is to be determined from the allegations made. (*Estate of Lewy* (1974) 39 Cal.App.3d 729, 734 [113 Cal.Rptr. 674].) From the allegations recited *ante,* it is apparent respondent asserts the defendants have acted wrongfully in refusing to implement the provisions of express written and signed agreements and to honor Mr. Weingart's unequivocally expressed intent and binding promises.

A conservator is a fiduciary, subject to the rules governing trustees. (Prob. Code, §§ 2100, 2101.) As a fiduciary, a conservator owes a duty of loyalty which requires that he act in the highest good faith. (See Prob. Code, § 16002, Cal. Law Revision Com. com., Deering's Ann. Prob. Code

---

[2] In arguing for a contrary interpretation of this action and others at issue herein, appellants rely heavily on *In re Kitchen, supra,* 192 Cal. 384. However, *Kitchen* is clearly distinguishable. The clause at issue in *Kitchen* provided that any beneficiary who "shall commence *any suit* in any court whatsoever or by any ways or means, *sue and disturb, . . .* my executor . . .,' or any other beneficiary," forfeited any legacy contained in the will of the testatrix. (At p. 389, italics added.) In sum, the "no contest" clause at issue in *Kitchen* was unlimited in breadth. In contrast, the instant cause contains *no* reference to merely suing or disturbing the executors; it only prohibits bringing suit to recover "anything of value . . . , [or] any of the assets of this Trust or my estate, or . . . any assets in which I had an interest immediately prior to my death," in *limited* circumstances. Where suit is brought to enforce claims "grounded on, arising out of, or related to any claimed or actual agreement, representation or understanding . . . expressly set forth in a written and executed agreement," the clause has no application. Since the "no contest" clause in *Kitchen* operated without limitation and the instant clause operates *with* limitations, the *Kitchen* court's application of the clause to the beneficiary's acts in that case provides no analogy for the application of the instant clause to respondent's acts.

(1987 pocket supp.) p. 287; West's Ann. Prob. Code (1986 pocket supp.).) He is liable for any breach of that duty. (*Vale* v. *Union Bank* (1979) 88 Cal.App.3d 330, 339 [151 Cal.Rptr. 784].)

Respondent clearly alleged, by reasonable inference, the conservators' duty to honor the terms of a written and signed agreement, as well as promises binding on Mr. Weingart which expressed unequivocally his intent to provide respondent with certain benefits. She further alleged their willful failure and refusal to do so, i.e., breach of duty evidencing a profound lack of good faith. Hence, the action most reasonably is viewed as one seeking the recovery of damages from the conservator defendants personally, rather than from the conservatorship estate.

Even if the claim for monetary damages of $1.3 million should be viewed as one against the conservatorship estate, the action was commenced more than four years before Mr. Weingart's death. Accordingly, it asserts a claim against his inter vivos estate, not his testamentary estate, and cannot be reasonably termed a claim to "any assets in which I had an interest *immediately prior* to my death." (Italics added.)

In any event, the claim to $300,000 in monetary damages also may be characterized reasonably as arising out of or related to an "understanding" or "representation" expressed in a written and executed (signed) agreement. The document entitled "Summary of Terms of Laura Winston Irrevocable Charitable Remainder Unitrust" was duly executed by Mr. Weingart on October 21, 1974. He evidenced a clear intent to create a binding written agreement and his signature was witnessed by William S. Kroger and Luta King. That document contains all essential elements of a valid declaration of trust. It identifies the trustor, the trustees, the beneficiary (respondent for the remainder of her lifetime and an existing charitable trust thereafter), the corpus ($2 million in tax-free municipal bonds), the benefits to be enjoyed and the manner of their distribution. It is signed and dated by the trustor and, indeed, witnessed by two disinterested parties.

To be sure, although it contains all essential elements of a valid declaration of trust, the trust itself is unenforceable. It was never funded and hence lacks a corpus. In addition, the question of Mr. Weingart's capacity to contract on October 21, 1974, never has been entirely resolved. However, there had been no adjudication of his incapacity at that time and, in any event, while the declaration of trust might have been subject to rescission upon a determination of incapacity it was not void. (Civ. Code, § 39; *Hellman Commercial T. & S. Bk.* v. *Alden* (1929) 206 Cal. 592, 603 [275 P. 794]; *Burgess* v. *Security-First Nat. Bank* (1941) 44 Cal.App.2d 808, 818 [113 P.2d 298].)

Moreover, the "no contest" clause does not specify that the "written and executed agreement" relied upon must be valid and enforceable. Such a broad reading of the clause need not be made to effectuate its intent, for the validity and enforceability of a document may depend on any number of legal variables with which the lay mind is ill equipped to wrestle.

Appellants attempt to characterize the purpose of the "no contest" clause overbroadly as preservation of the "integrity" of the estate. As noted *ante,* its clear purpose is to preserve Revocable Trust Number One and to effectuate Mr. Weingart's general testamentary plan. The preservation of the "integrity" of the estate as appellants mean it, i.e., to foreclose the possibility of expensive litigation, plays no role. "That litigation of [a claim] may entail substantial cost does not, without more, bring the proceeding within the scope of [a] forfeiture clause." (*Estate of Black* (1984) 160 Cal.App.3d 582, 589 [206 Cal.Rptr. 663], fn. omitted.)

The written and signed "Summary of Terms of Laura Winston Irrevocable Charitable Remainder Unitrust" specifically provides in paragraph 6.5: "Laura gives up any and all claims against Mr. Weingart's assets or estate, *except for*: "a. The net income from this Trust.

"b. *The property to be given her under Mr. Weingart's Fifth Codicil.*

"c. Any food or clothing, or other miscellaneous items not exceeding $10,000 per year, which Mr. Weingart may give her." (Italics added.) Significantly, Mr. Weingart deliberately and effectively deleted paragraph 7, which attempted to invoke a forfeiture should respondent violate the conditions of the trust. It is thus clear he wanted respondent to enjoy all benefits and claims mentioned therein, regardless of any subsequent acts on her part.

The emphasized language reasonably may be interpreted as permitting a claim to the property to be bequeathed by the fifth codicil to be treated as a claim which relates to an "understanding" embodied in "a written and executed agreement." Other written documents permit the identification of the precise claim thus permitted.

A document entitled "Summary of Agreement to Make a Codicil and Summary of the Fifth Codicil" provides: "Mr. Weingart agrees to make a Fifth Codicil to his Will, in which he will leave the following assets to Laura Winston: "1. The residence located at 228 South Hudson Avenue, Los Angeles, California;

"2. All of the clothing and household furniture located at the above residence, and Mr. Weingart's jewelry;

"3. Fifty thousand Dollars ($50,000) in cash. . . .

"Mr. Weingart agrees that he will not sell or give away the residence or furniture or jewelry and that he will not revoke or change the Fifth Codicil."

The "Fifth Codicil" provides in pertinent part: ". . . I give, devise and bequeath to Laura Winston:

"3.1 My interest in my residence at 228 South Hudson Avenue, Los Angeles, California 90004.

"3.2 All of my interest in the clothing, household furniture and furnishings located in my said residence and my jewelry.

"3.3 Fifty thousand Dollars ($50,000) in cash."

The two documents delineated above clearly identify the nature of the claim which relates to the "understanding" memorialized in subparagraph 6.5b of the written and signed agreement, "Summary of Terms of Laura Winston Irrevocable Charitable Remainder Unitrust." Moreover, although the "Fifth Codicil" clearly has no testamentary effect, in that it fails to comply with the requisite testamentary formalities, each of the above documents in itself arguably may be construed as a "written and executed agreement."

Each bears unequivocally intentional deletions in Mr. Weingart's handwriting and marked by his handwritten initials. The "Fifth Codicil" bears similar marks of approval and the typewritten copy is followed by the words, "These are gifts do not take away BW," in Mr. Weingart's handwriting.

■ The name of the party to be charged with execution of a written document satisfies the statutory requirement of "subscription" if it is intended as a signature, i.e., authentication of the document, regardless of where in the writing it appears. (*Marks* v. *Walter G. McCarty Corp.* (1949) 33 Cal.2d 814, 820 [205 P.2d 1025]; *Rader Co.* v. *Stone* (1986) 178 Cal.App.3d 10, 23 [223 Cal.Rptr. 806].) The essential element is an intent to appropriate the name as a signature; it need not be the full handwritten name to qualify. (*Marks, supra,* at p. 820.) Hence, even initials may qualify. (See, e.g., *Berdan* v. *Berdan* (1940) 39 Cal.App.2d 478, 483 [103 P.2d 622].)

■ As noted *ante,* the "Summary of Terms of Laura Winston Irrevocable Charitable Remainder Unitrust" is duly executed and, indeed,

witnessed. Subparagraph 6.5b clearly permits respondent to assert a claim to the "property to be given her under Mr. Weingart's Fifth Codicil." In light of Mr. Weingart's execution of *this* document, his initials on the "Summary to Make a Fifth Codicil [, etc.]" and on the "Fifth Codicil" arguably may be viewed as intended signatures, i.e., authentications that these documents express his wishes and he intends to be bound by them. However, this construction is not essential to avoiding the consequences of the "no contest" clause at issue here. The express mention in the duly executed written agreement intended to establish a trust that respondent retains a claim to property to be given her under Mr. Weingart's fifth codicil comprises a sufficient identification of an "understanding" or "representation" expressed in a "written and executed agreement" to avoid forfeiture under the terms of the "no contest" clause.

 Appellants next attack a petition for support and maintenance which respondent brought in the conservatorship proceedings on July 20, 1981, following Mr. Weingart's death. The petition alleges the conservators committed wrongful acts "to defraud [respondent] from her lawfully entitled benefits [for the sole purpose of precluding her] from efforts to restore [Mr. Weingart] to his lawful status, and dismiss the conservatorship . . . ." The conservators knew respondent was entitled to certain benefits, yet they deliberately and wrongfully ousted her from the enjoyment of those benefits to her considerable damage.

As noted *ante,* the character of a legal proceeding is to be determined from the allegations made. (*Estate of Lewy, supra,* 39 Cal.App.3d at p. 734.) As a fiduciary, a conservator has a duty to make payment of the maintenance and support of the conservatee and those legally entitled to the conservatee's support. (Prob. Code, § 2420.) The court may enforce the obligation by ordering such payment. (Prob. Code, § 2404.) In addition, the conservator-fiduciary owes a duty of loyalty requiring that he act in the highest good faith. (Prob. Code, § 16002.) He is liable for any breach of duty. (*Vale* v. *Union Bank, supra,* 88 Cal.App.3d at p. 339.)

Respondent has alleged an entitlement which imposes upon the conservators a duty to provide her with support and their willful and intentional disregard of that duty. In addition, she has alleged the conservators acted from base and fraudulent motives. Hence, the clear gravamen of the petition is to assert the conservators' official misconduct in breach of their fiduciary duty of loyalty. In sum, respondent sought to impose ultimate liability on the conservators themselves, *not* Mr. Weingart's estate. Since the petition thus posed no threat to Ben Weingart Revocable Trust Number One and asserted no claim to any asset of that trust or of Mr. Weingart's estate,

either inter vivos or testamentary, it ran afoul of no proscription contained in the "no contest" clause at issue.

■■■ Appellants also challenge as violative of the "no contest" clause a petition respondent brought in the probate proceedings pursuant to Probate Code section 851.5, in which she asserted a claim to Mr. Weingart's Hudson Street residence. The claim resembles those formerly asserted: it is grounded upon the original conservators' alleged interference, by instituting conservatorship proceedings wrongfully, with formal execution of the agreement to make a fifth codicil, thereby allegedly entitling respondent to the imposition of a constructive trust.

Undeniably, this particular petition asserts a claim to an asset of Mr. Weingart's testamentary estate. However, as discussed *ante,* since the claim relates to property to be given respondent under the fifth codicil, it is a claim "arising out of or related to" an "understanding" or "representation" expressed in "a written and executed agreement." Hence, it avoids forfeiture under the terms of the "no contest" clause.

■■■ Appellants further attack as violative of the "no contest" clause additional actions respondent took in the probate proceedings. They point first to respondent's petition to stay the interment of Mr. Weingart's remains, in which she asserted it was Mr. Weingart's testamentary intent and desire to be cremated. This petition asserts no claim to any asset of Ben Weingart Revocable Trust Number One or the testamentary estate; it attempts to secure no benefit whatsoever for respondent or any other person.

Hence, appellants' challenge can only be based upon the broad scope they urge for the "no contest" clause—the peaceful and orderly, litigation-free, administration of his estate. The necessarily strict construction of a "no contest" clause will not be extended beyond its plain meaning (*Estate of Black, supra,* 160 Cal.App.3d 582, 587); thus, as noted *ante,* the prospect of litigation and consequent expense to the estate does not in itself bring an action within the scope of a forfeiture clause (*id.,* at p. 589). Respondent's petition to stay the interment of Mr. Weingart's remains simply cannot be viewed reasonably as violative of that clause.

■■■ Appellants launch a similar attack on respondent's filing of a supplemental petition for probate. Respondent's supplemental petition did not dispute the legitimacy of Mr. Weingart's will and the four codicils originally offered for probate, but referred to additional codicils, three letters, the executed summary of the provisions of the Laura Winston Irrevocable Charitable Remainder Unitrust and the agreement, not formally executed, to make a fifth codicil, all of which respondent characterized as

testamentary documents. On April 8, 1981, the probate court ordered the supplemental petition for probate off calendar for defects in its documentation.

This petition clearly must be characterized as an offer of additional purported testamentary documents, an action long recognized as falling outside the purview of a forfeiture clause, in that it seeks to establish rather than frustrate the testator's intent. (*Estate of Lewy, supra,* 39 Cal.App.3d at p. 734.) It follows that respondent's filing of the supplemental petition cannot be viewed as violative of the "no contest" clause.

Appellants next point to various occasions upon which respondent objected to the executors' settlement of lawsuits involving the business interests of Mr. Weingart. Again, since those objections did not challenge the integrity of Mr. Weingart's testamentary plan and asserted no claim to any asset of Revocable Trust Number One or the testamentary estate, they fall outside the scope of the "no contest" clause. (*Estate of Black, supra,* 160 Cal.App,3d at p. 589.)

Appellants also attack respondent's motion for reconsideration of an order confirming the sale of Mr. Weingart's Hudson Avenue residence and appeal from the denial of that order. In her motion for reconsideration, respondent challenged the court's jurisdiction to order confirmation of the sale and the capacity of the executors. Such challenges fall outside the scope of a forfeiture clause, for they do not relate to the validity of the will or trust. (*Estate of Lewy, supra,* 39 Cal.App.3d at p. 734.)

On appeal, respondent attempted to challenge the propriety of the order denying her petition pursuant to Probate Code section 851.5, by which she asserted an interest in the Hudson Avenue residence. In an unpublished opinion, *Estate of Weingart/Winston* v. *Treharne, et. al.,* 2d Civil No. B016968 (Apr. 30, 1987), this court held the appeal was untimely and respondent's asserted interest in any event fell outside the scope of Probate Code section 851.5. However, as discussed *ante,* the petition itself does not violate the "no contest" clause; hence, an appeal seeking to challenge the court's denial of the petition cannot be viewed as violative of the clause.

Finally, appellants attack the entirety of the appeal taken in 2d Civil No. B016968. In addition to the order discussed above, respondent appealed from an order entered December 1, 1981, denying her motion for relief from the order admitting Mr. Weingart's will to probate and an order entered on June 4, 1982, which authorized the executors of the estate to sue

respondent for any damages resulting from her appeal of the order confirming the sale of the Hudson Avenue residence.

In essence, respondent asserted the order granting probate was void, in that one executor lacked capacity to serve and the order was procured through extrinsic or intrinsic fraud. She further contended the court abused its discretion in granting the executors authority to institute legal proceedings against her. Neither challenge on appeal attacks the validity of Revocable Trust Number One or Mr. Weingart's will and other testamentary documents. Hence, neither can be considered to fall within the scope of the "no contest" clause. (*Estate of Lewy, supra,* 39 Cal.App.3d at p. 734.) In sum, the trial court did not err as a matter of law in determining respondent had not violated the terms of the "no contest" clause, thereby forfeiting her right to the benefits provided for her in Revocable Trust Number One.

The order is affirmed.[3]

Hanson, J., and Lucas, J., concurred.

A petition for a rehearing was denied November 19, 1987, and appellants' petition for review by the Supreme Court was denied January 27, 1988.

---

[3] Respondent has lodged various exhibits with this court, requesting that they be made part of the record on appeal. Inasmuch as none of these exhibits has any relevance to the instant appeal, respondent's request is denied.